```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                     AT CHARLESTON
```

**UNITED STATES OF AMERICA**

**v.**                                            **CRIMINAL NO. 2:05-00161**

**PERRY FRENCH HARVEY, JR.**


### MEMORANDUM OPINION AND ORDER

Pending before the court is defendant's motion to dismiss the indictment based on outrageous conduct on the part of the government (Doc. No. 17).  At the hearing held on pretrial motions in this case, the court took this motion under advisement pending written opinion.  For the reasons outlined below, defendant's motion to dismiss is DENIED.

### I.  Factual Background

In July 2003, the United States and Thomas E. Esposito entered into a plea agreement pursuant to which Esposito agreed to plead guilty to misprision of a felony in violation of 18 U.S.C. § 4.  Thereafter and for an extended period of time, Esposito cooperated with the United States in its investigation of corruption in Logan County, West Virginia, under the supervision of agents associated with the Federal Bureau of Investigation.

During the course of this investigation, the United States avers that it gathered evidence indicating that corruption in Logan County elections was commonplace and widespread.  As the

investigation progressed, in part through Thomas E. Esposito meeting undercover with various persons, it became apparent that people were suspicious of a government investigation. Many people voiced concern about the need to take precautions to avoid governmental scrutiny during the 2004 election cycle. The United States avers that it concluded that extending their undercover operations through the 2004 election cycle would likely yield a great deal of evidence that could be used in prosecuting election fraud and governmental corruption.

As part of its investigation, the United States devised a plan whereby Esposito would file as a candidate for the West Virginia House of Delegates but would then withdraw his candidacy before the primary election in May 2004. Through Esposito becoming a candidate, the United States believed that it would be able to obtain evidence as to the corruption endemic to Logan County that it would be unable to gather through other means.

The United States avers that in deciding to have Esposito run for a limited time as a candidate, it followed the procedures outlined by the Department of Justice relevant to conducting undercover operations. The sting operation was approved by a number of officials affiliated with the U.S. Attorney's Office for this district and with the Federal Bureau of Investigation after consultations with the Department of Justice. As part of its efforts, the United States avers that it took precautions to

minimize the effect of this operation on other candidates for office, including:

> (1) having Esposito delay filing his candidacy until at or near the filing deadline;
>
> (2) having Esposito withdraw from the election in a very public fashion 27 days prior to the election; and
>
> (3) disseminating the fact that Esposito had withdrawn from the election to every media outlet serving the delegate district, including The Logan Banner and the Associated Press.[1] As a result of this publicity, the Logan Banner printed an front page, above-the-fold story about Esposito withdrawing.

The United States avers that the Esposito undercover operation resulted in a number of persons, including defendant, being caught trying to illegally influence elections. In the indictment filed against defendant, it is alleged that defendant, Esposito, and a third individual formulated a plan to buy votes for Esposito on April 12, 2004. The indictment alleges that Esposito provided $2,000 to defendant and the other individual for the purposes of vote-buying.

In his motion to dismiss the indictment, defendant notes that the government possesses no information that defendant ever actually bought any votes with the money. Defendant asserts that in this case, through its plan, the United States is guilty of the same crime that Esposito pled guilty to, misprision of a

---

[1] When Esposito withdrew, he reported that he was doing so out of concern for the health of his mother-in-law.

felony. Here, defendant states that through the government's scheme, the government injured the right of all voters to express their choice of candidate and have said choice be given full effect.

Defendant avers that the government's scheme resulted in the votes of honest voters being diluted. Defendant notes that even though he withdrew from the election, Esposito still received 2,175 votes and that his name appeared on the ballot. "By placing a false candidate in the election, a sham candidate . . . every vote that was cast for Esposito was a vote that an honest voter could have cast for an honest candidate. In essence, these votes were stolen by the government." (Doc. No. 17 at 4.) Further, defendant argues that placing defendant Esposito in the race, even for a short period, dissuaded other persons from running for that office. (Id.) Because of this conduct, defendant requests that the court dismiss the indictment outstanding against him or that the court, exercising its supervisory powers, exclude the evidence derived from this operation.

## II. Applicable Law

The law surrounding the "outrageous government conduct" defense is murky in much the same fashion as is the law surrounding the related entrapment defense. See John David Buretta, Note, Reconfiguring the Entrapment and Outrageous

Government Conduct Doctrines, 84 Geo. L.J. 1945, 1945 (1996). The root of the defense is that a doctrine bars conviction when the government's conduct is so "outrageous" that it "shocks the conscience" and therefore violates the Due Process Clause of the Fifth Amendment.  See Hampton v. United States, 425 U.S. 484, 495 n.7 (1976).  More often than not, this defense is raised following a governmental sting operation.  See Buretta, 84 Geo. L.J. at 1962 n.89.

The contours of the doctrine are not fully fleshed out under Fourth Circuit case law.  In United States v. Jones, 976 F.2d 176, 181-82 (4th Cir. 1992), the court found the doctrine inapplicable where defendant complained he had been entrapped by a confidential informant to convert shotguns to machine guns in hopes of receiving a large sum of money because defendant was not intimidated by the government and did not hesitate to commit the crime.  In United States v. Osborne, 935 F.2d 32, 37 (4th Cir. 1991), in examining a child pornography sting operation, the court held that the due process calculation incident to outrageousness "must take into consideration the nature of the crime involved."

The United States, apparently following United States v. Smith, 924 F.2d 889 (9th Cir. 1991), infers that the applicable legal standard for this case is fact-based, and that defendant fails to meet this standard.  See id. at 897 (listing cases).

Defendant inferentially appears to agree with the governing standard being fact-based, but disagrees with the United States' inference that this case falls outside this doctrine's outer limits.

As a general rule, appellate courts routinely affirm district court denials of motions to dismiss for outrageous government conduct.  See Smith, 924 F.2d at 897 (listing cases).  The reasons they give when they affirm these denials run from that the facts of individual cases fail to meet factor tests to outright rejection.  Compare United States v. Edenfield, 995 F.2d 197, 200 (11th Cir. 1993), cert. denied, 513 U.S. 818 (1994) (applying a "totality of the circumstances" test) and United States v. Citro, 842 F.2d 1149, 1153 (9th Cir.), cert. denied, 488 U.S. 866 (1988) (holding that the government's involvement must be "malum in se," or equal to engineering and directing crime, to rise to outrageous government conduct); see also United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993) ("The banner of outrageous conduct is often raised but seldom saluted.").

In aggregate, the courts of appeal have identified four factors to be used in evaluating whether particular government conduct is outrageous:

    (1)    the extent to which defendant participated in the crime;[2]

    (2)    whether the defendant's criminal activity predated the government's involvement in the crime;[3]

    (3)    the extent of government involvement in the crime;[4] and

    (4)    the nature of the involved crime.[5]

Because the Fourth Circuit's decisions in this area provide little guidance as to the particulars of this case, the court will examine all of these factors in its analysis.

### III. Analysis

The focus of defendant's motion is the nature of the sting involved and particularly the crime the government committed in the course of the sting. Even accounting for all of the precautions the government took, defendant notes that because

---

[2] See United States v. Smith, 7 F.3d 1164, 1168 (5th Cir. 1993) (holding that defendant bears the burden of proving he was not an active participant); Jones, 976 F.2d at 181-82 (holding that there was no outrageous conduct when defendant did not hesitate to commit a crime and was not intimidated by government conduct).

[3] See United States v. Bogart, 783 F.2d 1428, 1435-36 & n.7 (9th Cir.), vacated and remanded sub nom., United States v. Wingender, 790 F.2d 802 (9th Cir. 1986).

[4] See, e.g., Smith, 7 F.3d at 1168 (holding that defendant bears the burden of proving government overinvolvement in crime); United States v. Mosley, 965 F.2d 906, 911 (10th Cir. 1992) (suggesting "government creation" and "substantial coercion" as factors).

[5] United States v. Osborne, 935 F.2d 32, 37 (4th Cir. 1991) (requiring consideration of the nature of the crime).

defendant did not meet the withdrawal deadline for getting a candidate's name off the ballot outlined in W. Va. Code § 3-5-11, Esposito's name appeared on the ballot and 2,175 people votes for him.  Defendant notes that he was among these people, so he was also effectively disenfranchised.[6]  Further, defendant notes that one candidate who lost did so by less than 400 votes, far less than by the number of votes Esposito received post-withdrawal.  Finally, defendant avers that other persons may have put their hats into the ring for the seat Esposito was seeking should he have not announced himself as a candidate.

Two of the four criteria courts have used in evaluating motions to dismiss for outrageous government conduct are clearly inapplicable to this case.  Regarding the first factor, on the whole, it is clear that the government alleges defendant participated in a crime.  Defendant does not allege entrapment.  In the indictment, the government alleges that defendant was an active participant in the crime with which he is charged.  Unlike in the Fourth Circuit case of Jones, there are no allegations that he was coerced into doing anything: in the conduct alleged in the indictment, defendant appears to be participating as a result of his own volitional choice.  Regarding the second

---

[6] Defendant did not endeavor to explain either how he was not aware of Esposito's withdrawal having offered to aide his election, or why he voted for him knowing that he was no longer a candidate.

factor, assuming the United States did something illegal in this case, it occurred well before defendant's alleged behavior.  By the time defendant allegedly committed illegal activity, any wrong the government committed had already occurred.  When defendant's allegedly illegal actions occurred, it was already clear that Esposito's name would appear on the ballot.

The third factor is similarly inapplicable because the crimes allegedly committed by the United States and defendant are different, even if one accepts defendant's contention that their actions may have had similar effects.  Defendant was charged with violating 42 U.S.C. § 1973i(c) through offering to pay others to vote.  Defendant alleges that, in the course of their investigation, government agents violated 18 U.S.C. § 241 through allowing Esposito's name to appear on the ballot when it was clear that he would not run for office.  As these are different crimes, the third criteria courts have used in evaluating motions like this one is also inapplicable.

The fourth factor, however, is clearly applicable.  In Osborne, the Fourth Circuit made it clear that it was willing to consider the nature of the outrageous behavior in determining whether it was appropriate to dismiss an indictment for outrageous government behavior.  See 935 F.2d at 37.  There, the court evaluated a situation where a postal inspector mailed a brochure to a defendant offering child pornography.  Id. at 34.

The court found that the government's conduct must be so outrageous as to shock the conscience of the court.  <u>Id.</u> at 36 (citing <u>United States v. Jacobson</u>, 916 F.2d 467 (8th Cir. 1990) (en banc)).

Here, in looking at the totality of the circumstances involved surrounding the government's alleged behavior, the court's conscience is not shocked in the slightest.  As such, defendant's motion to dismiss the indictment must be denied.

Defendant argues that the government's actions resulted in 2,175 persons being deprived of their vote for the West Virginia House of Delegates, and that the court should dismiss the indictment because the executive branch of the federal government disenfranchised them.  These numbers, if viewed in a vacuum, represent a terrible thing.  In context, they are not.  As defense counsel admitted at argument, corruption has been endemic to West Virginia politics in general, and Logan County politics specifically, for longer than living memory.  It has been nearly impossible to prosecute corruption in Logan County because persons with knowledge of it are reluctant to testify against others in their community.  Putting Esposito forward as a candidate may have been the only possible means to clean up the political process in Logan County.  Though the court is unwilling in any sense to condone operations like the one involving

Esposito that ensnared defendant universally, when viewed in context, the government appears to have acted appropriately.

Second, the government went to great lengths to make sure that people in Logan County were aware that Esposito was not running for the West Virginia House of Delegates. They made sure the information was disseminated to the media. The newspaper ran an above-the-fold story about it. Television stations ran stories about it. In a small community where people for the most part know their politicians, these would be noticed, as would the fact that such things as his campaign signs disappeared.

Finally, defendant's arguments at hearing that Esposito and the government may have committed other violations of campaign laws in the course of this investigation also ring hollow. It is in no way clear how dismissing the indictment against this defendant, or even excluding certain evidence as suggested by defense counsel, would provide remedy in the slightest for any alleged failure to report expenditures on signs or on political dinners.

Given the totality of the circumstances, the court finds that no outrageous governmental conduct occurred in this case. As such, defendant's motion to dismiss the indictment is DENIED.

### IV.  Conclusion

For the reasons outlined above, defendant's motion to dismiss based on outrageous government conduct is hereby denied.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

IT is SO ORDERED this 1st day of December, 2005.

                                  Enter:

                                  David A. Faber
                                  United States District Judge